387 A.2d 63

COMMONWEALTH of Pennsylvania, Appellee,

v.

Joesph P. SERO, Appellant.

Supreme Court of Pennsylvania.

Argued May 27, 1977.

Decided April 28, 1978.

Frederic G. Antoun, Jr., Asst. Public Defender, for appellant.

LeRoy S. Zimmerman, Dist. Atty., Thomas J. Williams, III, Reid H. Weingarten, Deputy Dist. Attys., for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

MANDERINO, Justice.

Appellant Joseph Sero was tried before a judge and jury and convicted of murder of the first degree for the shooting death of his wife. Post-verdict motions were denied, and on September 3, 1976, appellant was sentenced to life imprisonment. This direct appeal followed. We now affirm the judgment of sentence.

Although appellant does not challenge the sufficiency of the evidence to sustain the conviction of murder of the first degree, we nevertheless must review the record to determine whether the evidence is sufficient to establish all the elements of that offense. 19 P.S. § 1187 (1964). Viewing the evidence in the light most favorable to the prosecution, the evidence is sufficient if, accepting as true all the evidence and all reasonable inferences upon which, if believed, the jury could have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that appellant is guilty of murder of the first degree. *See, e. g., Commonwealth v. Motley*, 472 Pa. 421, 372 A.2d 764 (197–); *Commonwealth v. Pitts*, 450 Pa. 359, 301 A.2d 646 (1973). Reviewing the record in this light, we are persuaded that the jury's finding of the necessary elements of the offense is supported by sufficient evidence.

The prosecution's evidence established that on the evening of August 18, 1975, appellant and his wife had dinner together at a Harrisburg restaurant. The two left together at approximately 10:30 p. m. At 10:50 p. m., a nurse at Harrisburg Hospital observed appellant drive his car through a red light in front of the hospital and enter the front entrance of the hospital at a high rate of speed.

Appellant's wife was in the front seat of the car, bleeding profusely from the mouth. Appellant shouted that someone shot his wife and asked directions to the emergency room.

Upon arriving at the emergency room entrance, appellant encountered two Harrisburg policemen in their patrol car about to go off duty. Both testified that appellant went over to the patrol car and stated that it was appellant that shot his wife. One officer testified that appellant's words were, "Oh my God, I shot my wife, help me," the other testified that appellant stated, "Oh my God, I just shot my wife." A third person, an off-duty police officer working as a hospital security guard, also testified that he heard appellant say "God, help me, I shot my wife. . . ." One officer, not sure of what he had just heard, asked appellant to repeat what he had said. Appellant again stated it was he who shot his wife.

Appellant was read his constitutional rights, at which point he stated it was not he but an unknown assailant who shot his wife. Appellant testified that either a black man, or a person with a black glove on his hand, walked up to appellant's car while he waited at a traffic light, and through the open rear window on the passenger side, fired a single shot into the back of his wife's head.

The prosecution produced substantial testimony to refute appellant's version of the shooting. Expert witnesses testified that the muzzle of the gun had been held directly against a scarf appellant's wife was wearing. Tests were conducted at the location appellant claimed the shooting took place. The police used a gun of the same caliber of the weapon that killed Mrs. Sero (the actual murder weapon has never been found), to determine whether powder residue would have been placed on the seat back and headrest if the incident had occurred as described by appellant and the gun had actually been placed against Mrs. Sero's scarf. No powder residue was found on the seat back or headrest after it was analyzed on the night of the crime, but large amounts were found after these test firings. The prosecution also produced two witnesses who lived near the site at which

appellant claims the incident occurred. Neither heard any loud noises near the time appellant claims the shooting occurred, yet both witnesses testified they clearly heard the gun shots fired when the police conducted the aforementioned test outside their homes approximately four weeks after the actual shooting.

The prosecution also presented evidence to establish the motive appellant might have had for killing his wife. The prosecution presented testimony that appellant was in serious financial difficulties. His business had nearly failed while under his management, he had substantial loans outstanding, and appellant's home was scheduled to be sold at a sheriff's sale for failure to make mortgage payments. Appellant received notice of the sheriff's sale the same day his wife was shot. Although appellant's own life insurance policy had been cancelled, appellant kept up a $10,000 double indemnity life insurance policy on his wife as well as $25,000 of mortgage insurance on her life. It was also established that appellant had been discussing insurance matters with his insurance agent five days prior to the shooting, and that appellant telephoned his insurance company, in an effort to facilitate the processing of his claim, within hours after his wife expired.

Although the murder weapon was not discovered, appellant's insurance agent testified that in 1973, he saw a revolver in appellant's desk drawer at his place of business. The prosecution's last witness, a medical secretary employed at Harrisburg Hospital, testified that she observed appellant with his wife in the hospital's intensive care unit the day after the shooting, that he squeezed his wife's hand a number of times and stated in a normal speaking voice: "Son-of-a-bitch deserves to die."

Mrs. Sero died four days after the shooting, without ever regaining consciousness. Death was due to "massive damage to the brain and massive hemorrhage in the brain in the subarachnoidal space." These facts satisfy us that the evidence, taken as a whole, is sufficient to sustain the jury's conclusion that the killing was "willful, deliberate and pre-

meditated" and thus constituted murder of the first degree. 18 Pa.C.S.A. § 2502(a), (d) (Supp.1977--78).

Appellant's first assignment of error is that certain juror misconduct warrants the grant of a new trial. Three weeks after the jury returned its verdict in the instant case, a woman who served as a juror was deposed and gave a statement in which she related what she believed to be jury misconduct. The only issue raised concerning the juror's deposition is the juror's statement that another juror told her that this juror's husband had spoken to appellant's brother who allegedly told him appellant was not a religious person but began studying the Bible after his wife's death. Appellant claims this was misconduct on the part of a juror's spouse, that prejudicial information was improperly communicated to a juror, and that this Court's decision in *Commonwealth v. Santiago*, 456 Pa. 265, 318 A.2d 737 (1974), mandates a new trial. The prosecution argues alternatively that the juror's statement is an incompetent effort to impeach the jury's verdict; that the statement is objectionable as triple hearsay; and that prejudice that might have resulted from the conversation was harmless.

It is well established in this Commonwealth that a juror may not impeach his or her own verdict after the jury has been discharged, and a juror is not competent to testify as to what transpired in the jury room. *Commonwealth v. Pierce*, 453 Pa. 319, 322, 309 A.2d 371, 372- 73 (1973); *Commonwealth v. Patrick*, 416 Pa. 437, 442, 206 A.2d 295, 297 (1965); *Friedman v. Ralph Brothers, Inc.*, 314 Pa. 247, 249, 171 A. 900, 901 (1934). There are sound policy reasons, detailed elsewhere, for a rule which protects the inviolability of jury deliberations, and we need not reiterate those reasons here. *See Friedman v. Ralph Brothers, Inc., supra*, 314 Pa. 247, 171 A. 900 (1934). *See also Government of Virgin Islands v. Gereau*, 523 F.2d 140, 148 (3d Cir. 1975).

In applying this rule, however, this Court has recognized that a flat prohibition against reviving such testimony would contravene another selfishly guarded public policy: that of insuring that an accused is judged by an impartial,

indifferent jury of his peers. *See Commonwealth v. Santiago*, 456 Pa. 265, 318 A.2d 737 (1974); *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972). We can maintain the viability of the jury as a judicial decision-making body only by guaranteeing that a verdict is reached by evidence and argument in open court, not by outside influences that might strip the jury of the impartiality we demand.

To accommodate these conflicting policies, we have carved out a narrow exception to the canon of "no impeachment," allowing post-trial testimony of extraneous influences which might have affected the jury during their deliberation. *Compare Commonwealth v. Pierce, supra*, 453 Pa. at 322, 309 A.2d at 372–73, *with Commonwealth v. Zlatovich*, 440 Pa. 388, 394–97, 269 A.2d 469, 472–73 (1970), *and Welshire v. Bruaw*, 331 Pa. 392, 200 A. 67 (1938). *Accord*, Fed.R.Evid. 606(b); *United States v. Eagle*, 539 F.2d 1166, 1169–71 (8th Cir. 1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977).

█ In light of these principles, we cannot agree with the prosecution that this witness was incompetent to testify, after the jury was discharged, to remarks communicated to another juror. Information, if prejudicial, that reaches a juror through a third party is precisely the evil our exception to the no impeachment rule is intended to obviate.

█ We agree with the prosecution, however, that the alleged jury misconduct in this case, as related by the deposed juror, is not sufficient to warrant the grant of a new trial. Appellant contends that the juror who heard that appellant had begun to read the Bible after his wife's death would infer that appellant had a consciousness of guilt and was in a penitent mood in prison. Even assuming that this statement was communicated to the juror's husband and then to a juror, and that this juror could draw such an inference, this information does not create the potential for prejudice that we have said can emasculate a jury's impartiality and indifference, thus mandating a new trial. *See Commonwealth v. Santiago, supra*, 456 Pa. 265, 318 A.2d 737

(1974) (juror told by a witness, during a recess, that defendant had killed on more than one occasion); *Commonwealth v. Bobko*, 453 Pa. 475, 309 A.2d 576 (1973) (jury given a booklet that defendant was under indictment for charges unrelated to those for which the jury had been selected).

Appellant next assigns as error the trial court's allowing into evidence the results of neutron activation tests introduced to discredit appellant's version of the shooting. Appellant does not challenge the neutron activation testing process itself, but argues that due to variables which impacted on the reliability of the test results, and due to test conditions not substantially similar to the original shooting, the tests had no probative value and were thus inadmissible.

The prosecution had established, through expert testimony, that Gloria Sero was shot with a .32 caliber handgun while the muzzle of the gun was held against the scarf she was wearing the night of the shooting. In accordance with appellant's reenactment of the shooting, two tests were conducted to determine whether such a "contact" wound, inflicted with a .32 caliber pistol, would leave deposits of gunpowder residue in appellant's car. For the experiment, the police determined where Gloria Sero's head would have been had she been sitting forward when she was purportedly shot, and where her head would have been had she been sitting back in the seat, and made a test firing with a simulated object in each position. In both positions, substantial residue was deposited on the inside of the car; police investigation of the Sero vehicle on the night of the shooting revealed no traces of gunpowder residue.

The decision to admit the results of experiments, like the decision to admit other forms of evidence, is ordinarily one for the trial court's discretion, reviewable only for an abuse of that discretion.. See generally *McCormick on Evidence* § 202, at 485-86 & n.17 (2d ed. 1972). We fail to see an abuse of discretion in the decision to admit these test results. Authority is unanimous that test results of experiments are admissible if the conditions under which the experiment was conducted are "substantially similar" to the

conditions involved in the commission of the crime; to attain identical conditions is often impossible. *See Commonwealth v. Craven*, 138 Pa.Super. 436, 443, 11 A.2d 191, 195 (1940). 13 *Wharton's Criminal Evidence* § 624, at 225 (13th ed.    ); *McCormick, supra*, at 485–88. Accepting appellant's argument that variables such as the position of the front seat and the angle from which the gun was fired may have affected the test results, this fact was brought out to the jury and fully exploited on cross-examination, and the extent to which the actual conditions may have deviated from the test conditions was a consideration for the jury in determining the weight to be accorded the evidence. We are satisfied from a review of the record that the conditions under which the experiments were conducted were substantially similar to the facts as stated by the appellant. The experiments were therefore probative of the truthfulness of appellant's testimony, and we find no abuse of discretion in allowing into evidence the results of the experiments.

■    Appellant's third assignment of error is that the trial court erred when it refused to charge the jury that certain expert testimony was "low grade." Appellant's brief does not specify which expert testimony he believes was "low grade," or whether he contends all the prosecution's expert testimony should be classified as such. Regardless, our case law makes it clear the trial judge did not err in refusing appellant's requested charge in this regard.

*Commonwealth v. Thomas*, 448 Pa. 42, 51, 292 A.2d 352, 357 (1972), sets forth two situations in which an expert's opinion testimony should be classified as "low grade":

> "Opinion evidence is correctly classified as 'low grade' in situations where the expert testifies not from personal observation but expresses an opinion in response to a hypothetical question. *Girsh Trust*, 410 Pa. 455, 189 A.2d 852 (1963). The same classification is warranted where the expert's opinion, based on theoretical assumptions, is rebutted by direct evidence. *Handfinger v. Phila. Gas Works*, 439 Pa. 130, 266 A.2d 769 (1970)."

Neither situation is applicable in the present appeal. The prosecution's experts testified from personal observation and tests which they performed, not from hypothetical questions posed to them. Nor were the experts' opinions in any way contradicted by direct evidence. The trial court therefore did not err in refusing to classify the prosecution's expert testimony as "low grade."

Appellant's fourth assignment of error involves the police's obtaining of appellant's car two days before his arrest in order to conduct the experiment previously discussed. Appellant claims a search warrant should have been procured, and since this was not done, evidence obtained is inadmissible. We do not know what "evidence" appellant refers to; no tangible evidence discovered as a result of the police use of the car was admitted into evidence. Appellant may be referring to the evidence of the tests conducted after the police obtained the use of the car.

Assuming, without deciding, that there is some evidence here that may have been inadmissible because unlawfully obtained, we agree with the prosecution that appellant had abandoned the car, and the consent given the police by the person to whom appellant abandoned the car obviated the need to obtain a search warrant.

On the night of the shooting, appellant gave the police permission to search his automobile. After a thorough search, the automobile was returned to appellant. Shortly afterwards, appellant gave the car to one of his employees, one Larry Shaffer. Shaffer testified as a defense witness, and his uncontroverted testimony was that appellant gave him the car because appellant "never wanted to be in that car again, he never wanted to ride in it again, he didn't want anything to do with it." Shaffer gave the police permission to use the car for the tests.

It is well settled that where there has been an abandonment of property, the new possessor may consent to a police search of the property and the search is not illegal. E. g., *Abel v. United States*, 362 U.S. 217, 240 41, 80 S.Ct. 683, 4 L.Ed.2d 668, 687 (1960); *Commonwealth v. Coyle*, 415

452

Pa. 379, 396–97, 203 A.2d 782, 791 (1964). The determination of whether or not there has been an abandonment of property is an ultimate fact, dependent upon the purported act of abandonment and the manifested intent of the person alleged to have abandoned the property. *See generally Friedman v. United States*, 347 F.2d 697, 704–706 (8th Cir. 1965), and cases cited therein. We are satisfied from the uncontroverted testimony of appellant's employe that appellant intended to and did in fact abandon control of the car, so that the employe's consent to use of the car dispensed with the need to obtain a search warrant.

■ That legal title had not been transferred is not determinative of the legality of this search. The test for abandonment is whether the complaining party could retain a reasonable expectation of privacy in the property allegedly abandoned. *See United States v. Akin*, 562 F.2d 459, 464 (7th Cir. 1977); *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1972). Under the facts of this case, in which appellant had already once consented to a full search of the car, and subsequently expressed a desire not to maintain control over the car in any way, we believe appellant could not have had a reasonable expectation of privacy that was violated by the later use of the car.

Lastly, appellant claims his second statement to the Harrisburg police officer, in which the officer testified appellant repeated that he shot his wife, was inadmissible because not preceded by *Miranda* warnings. The prosecution contends that the statements were volunteered, that the officer's request of appellant to repeat the statement was not interrogation but only an effort on the officer's part to make sure he heard appellant correctly, and that the question was only a spontaneous reaction that any person would have when first hearing someone say "I just shot my wife." Therefore, contends the prosecution, the admission of appellant's second statement is not barred by the Fifth Amendment. We agree.

■■■■ The Fifth Amendment has never been interpreted to render inadmissible statements freely volunteered to law enforcement officials. As the Supreme Court stated in *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966):

> "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

In *Commonwealth v. Simala*, 434 Pa. 219, 226, 252 A.2d 575, 578 (1969), we held that a volunteered statement is one not made in response to police conduct "calculated to, expected to, or likely to evoke admissions." If the statement is "given freely and voluntarily without any compelling influences," it is admissible notwithstanding the lack of *Miranda* warnings. *Commonwealth v. Yount*, 455 Pa. 303, 309, 314 A.2d 242, 246 (1974), citing *Miranda, supra*, 384 U.S. at 478, 86 S.Ct. at 1629, 16 L.Ed.2d at 726. *Miranda* warnings are called for only if the police questioning constitutes interrogation; that is, likely or expected to elicit a confession or other incriminating statements. *See Commonwealth v. Simala, supra; Commonwealth v. Boone*, 467 Pa. 168, 354 A.2d 898 (1975); *Commonwealth v. D'Nicuola*, 448 Pa. 54, 292 A.2d 333 (1972). *Cf. Commonwealth v. McLaughlin*, 475 Pa. 97, 379 A.2d 1056 (1977).

■■■■ We are satisfied from a review of the record that both of appellant's statements were volunteered, and made without any compelling influences. Asking appellant to repeat what he had said was a spontaneous reaction, not interrogation calculated to elicit incriminating statements. *Compare Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The circumstances under which appellant made the first statement were sufficiently startling that a reasonable person might make an inquiry to ensure that he actually heard what he believed he heard. In this case, the officer testified he was only seventy percent sure appellant said it was he who shot his wife. Moreover, the appellant was asked nothing more than to repeat what he had said; he was not asked any other questions. Therefore,

the case relied on by appellant, *Commonwealth v. Jefferson,* 423 Pa. 541, 226 A.2d 765 (1967), where additional questions were asked the defendant after the initial volunteered statement, is clearly distinguishable. Appellant's second statement, made in response to a spontaneous, clarifying inquiry after appellant had volunteered that he shot his wife, was not barred by the absence of *Miranda* warnings and its use as evidence was constitutionally permissible.

Judgment of sentence affirmed.