403 A.2d 544

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Anthony ROBERSON, Appellant.**

Supreme Court of Pennsylvania.

Argued April 19, 1979.

Decided July 5, 1979.

588

Austin J. McGreal, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty., Cynthia Severinsen, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

MANDERINO, Justice.

Appellant, Anthony Roberson, was arrested and charged with robbery, criminal conspiracy, murder, voluntary manslaughter, and involuntary manslaughter. Prior to trial, the court denied appellant's motion to suppress a signed statement in which appellant admitted responsibility for the incident. Appellant was tried before a jury and was convicted of conspiracy, robbery, and murder of the third degree. Post-verdict motions were denied, and appellant was sentenced to three terms of imprisonment of ten to twenty years. The robbery term was to run consecutive with the murder term, and the conspiracy term was to run concurrent with the robbery term. This direct appeal followed. Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1). For the reasons stated, we affirm.

Appellant was convicted of having participated in the robbery and fatal beating of an elderly woman, Genevieve Meier, as she was walking down the street. The victim died about a month after the incident as a result of extensive injuries to the head and chest.

Appellant in this appeal contends that the evidence as to the cause of death and the evidence identifying him as a participant was insufficient. Viewing the evidence in the light most favorable to the prosecution and accepting as true all the evidence, and all reasonable inferences deducible from it, from which, if believed, the jury could have based its verdict, we conclude that the prosecution met its burden of proving appellant's guilt beyond a reasonable doubt. *Commonwealth v. Helm,* 485 Pa. 315, 402 A.2d 500 (1979), *Commonwealth v. Horton,* 485 Pa. 115, 401 A.2d 320 (1979).

Appellant first contends that the evidence was insufficient to establish beyond a reasonable doubt the medical causation between appellant's acts and the victim's death. We reject that contention.

Appellant bases his argument on the fact that Dr. Robert Segal, the prosecution's medical witness, referred to pneumonia as the terminal cause of death. Appellant argues that the witness's testimony did not eliminate the possibility that the victim's pneumonia was caused by factors independent of the appellant's conduct. Appellant also argues that the witness's medical opinion was not sufficiently definite as to causation. We cannot agree. The medical witness's testimony left no doubt that appellant's conduct started an unbroken chain of causation which led to the victim's death. *Commonwealth v. Green,* 477 Pa. 170, 174, 383 A.2d 877, 879 (1978); *Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d 600 (1973); *Commonwealth v. Carn,* 449 Pa. 228, 296 A.2d 753 (1972).

The prosecution's medical witness, who had performed the autopsy on the victim, testified concerning extensive injuries suffered by the victim in her head and chest areas. His external examination revealed areas of bruising over the entire right side of the victim's face and head, on the right

side of her body above the hip, and on the right thigh. The internal examination revealed mainly head injuries including "extensive hemorrhage in the scalp on the right side of the head," and "arachnoid hemorrhage on the left side," and "hemorrhage in the left cerebellar hemisphere (the back portion of the head, above where the spine attaches to the skull)", as well as "areas of bruising in the brain." Dr. Segal's autopsy also revealed multiple fractures of several ribs, all of which were in the process of healing.

During direct examination, the witness then gave his opinion as follows:

"Q. Now, Doctor Segal, based on the number of autopsies or post-mortems that you have conducted, sir, your observations, both externally and internally, were you able to reach a conclusion as to the cause of death of one Genevieve Meier?

A. Yes.

Q. And what was that conclusion, sir?

A. *The cause of death was due to the combined effect of the injuries to the head and chest.*

Q. Doctor Segal, could you testify, sir, to a degree of medical certainty that the injuries to the head and the chest was the cause of Mrs. Meier's death?

A. Yes. . . ." (Emphasis added.)

During cross-examination, the witness testified as follows:

"Q. After you had seen this woman, Doctor, after you examined the body—I am sorry, it was one month after the information you got concerning the injury, wasn't it?

A. No, the death occurred approximately one month after the injury. I did not receive any information until after the death occurred.

Q. That is what I am asking you.

A. I am sorry, I misunderstood the question.

Q. Could this woman have died of pneumonia?

A. The pneumonia was in fact the immediate cause of her death.

Q. You don't know what happened within that month, do you?

A. That is not entirely true. I know that she was in the hospital and remained in the hospital in a comatose state from the date of admission to the time of death.

Q. *And you are saying the cause of death was multiple injuries?*

A. *That's correct.*

Q. Did you prepare a death certificate in this case?

A. Yes, I did.

Q. What did you put on it? What did you put down as a cause of death?

A. *The cause of death, and I quote, multiple injuries of head and chest.*

Q. What date was that signed?

A. The death certificate was signed April 17, 1976.

Q. Are you saying she died from pneumonia?

A. I said pneumonia was the immediate cause of death or what we call a terminal event. A patient in a hospital, for whatever cause, will either get better or get worse. If they get worse, they may go on to die. During the hospitalization they may develop complications of the basic illness that brought them to the hospital. This complication might ultimately lead to death. One of the common complications of people who are hospitalized, again for whatever reason, is an infection of the lungs and it is called bronchial pneumonia. In this case that was the terminal event that resulted in the death.

Q. The terminal event?

A. That's correct. . . ." (Emphasis added.)

During redirect, the witness testified:

"Q. Doctor, does the fact that the terminal cause of death in this case was pneumonia, alter your opinion as to the cause of the death of Genevieve Meier?

A. No, that was known to me at the time I did the autopsy. The role that the pneumonia played in the death was taken into consideration in the initial formulation of my opinion as to the cause of death and remains the same. The cause of death is due to multiple injuries, complicated by the pneumonia, but for the injuries, the patient wouldn't have been hospitalized and wouldn't have developed the pneumonia and would not have died. . . ."

The evidence established that the multiple injuries to the head and chest inflicted by appellant started in motion a chain of events which culminated in death, and that evidence was sufficient to permit the jury to conclude, beyond a reasonable doubt, that the injuries inflicted by appellant were the legal cause of death. *See Commonwealth v. Green, supra,* 477 Pa. at 175, 383 A.2d at 880.

In his causation argument, appellant has relied on *Commonwealth v. Embry,* 441 Pa. 183, 185, 272 A.2d 178, 179 (1971). *Embry,* however, is not controlling. In that case, the prosecution's only evidence directly linking the defendant's actions to the death of the victim was the medical examiner's own testimony that he was not convinced beyond a reasonable doubt that the struggle produced the stress which could have caused the myocardial infarction. Furthermore, the post-mortem examination revealed that the victim had " 'evidence of long-standing disease of the coronary arteries' and 'evidence of old scarring in the heart from previous heart attacks, previous myocardial infarctions.' " By contrast, in the instant case, the medical witness testified that even though pneumonia was the terminal event, that did not alter his opinion that the "cause of death [was] due to multiple injuries, complicated by the pneumonia, but for the injuries, the patient wouldn't have been hospitalized and wouldn't have developed the pneumonia and would not have died." The evidence was sufficient in this case to prove

causation beyond a reasonable doubt. *See Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1973).

Appellant next contends that, as a matter of law, the evidence identifying him as a participant in the robbery and beating of the victim was insufficient. We cannot agree.

■ Shortly before the crime took place, appellant and four friends, were standing together outside of a bar from which they had exited. At that time the victim came out of the bar and began walking along the street. Appellant asked the group if anybody "wanted to get a beat." There was testimony that this meant "make some money." Appellant then said "Let's get a beat," as he and one of his friends began following the victim. The other three friends trailed along at some distance behind. One of the three left the group before anything happened. The other two, however, testified that they witnessed the incident. Their combined testimony established that appellant and his companion acting together snatched the victim's pocketbook, knocked her down, hit her in the face and kicked her. Appellant argues that the testimony of these two witnesses should not be accepted because it was dark and they had been drinking intoxicating liquor that evening. These factors, however, do not warrant the rejection of this identification testimony as a matter of law. The question of credibility was for the jury. *Commonwealth v. Myrick,* 468 Pa. 155, 360 A.2d 598 (1976).

■ Appellant also contends that the testimony of the two eyewitnesses should be rejected, as a matter of law, because the distance between them and the victim when she was attacked was too great to allow any reliable identification. The evidence establishes that the distance was about sixty feet. Although under different circumstances such a distance would make reliable identification doubtful, we cannot reach that conclusion under the circumstances of this case. The eyewitnesses were friends of appellant and were with appellant when he and his companion began following the victim. Appellant and his companion were in view up until

the time the victim was attacked. Under these circumstances it is not significant that the distance and the lighting conditions may have been such that the eyewitnesses might not have been able to "see" the specific facial and bodily characteristics of appellant and his companion.

The evidence presented was sufficient to establish proof of identity beyond a reasonable doubt. *Commonwealth v. Hickman,* 453 Pa. 427, 309 A.2d 564 (1973).

 Finally, appellant contends that his confession was inadmissible at trial because appellant did not voluntarily waive his *Miranda* rights. This Court has said that:

"The burden to prove a valid waiver by a preponderance of the evidence is upon the Commonwealth, *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972), and our responsibility upon review is to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Bundy,* 458 Pa. 240, 328 A.2d 517 (1974); *Commonwealth v. Stafford,* 451 Pa. 95, 101, 301 A.2d 600 (1974); *Commonwealth v. Sharpe,* 449 Pa. 35, 44, 296 A.2d 519, 524 (1972). In making this determination, we are to consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Culombe v. Connecticut, supra* [367 U.S. 568] at 604 [81 S.Ct. 1860, 6 L.Ed.2d 1037]; *Commonwealth ex rel. Butler v. Rundle, supra,* 429 Pa. [141] at 149–150, 239 A.2d [426] at 430–431." *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892, 895 (1975).

Applying this standard, the following facts are established:

Appellant was arrested on March 17, 1976, at approximately 4:35 a. m., at his parents' home without a warrant for an assault and robbery involving the victim. At that time, appellant was eighteen years of age. Appellant was advised of the charges against him and also was advised of

his *Miranda* rights. Appellant was then transported to the police administration building where he arrived ten minutes later. Upon appellant's arrival at this building, he was again advised of his *Miranda* rights and of his constitutional rights by Detective Michael Chitwood. Appellant then told Detective Chitwood that he had been informed of his constitutional rights and also that he understood them. Appellant added that he did not want to exercise his constitutional rights. Appellant then said that he wanted to give a statement to the police. Detective Chitwood was relieved at 5:23 a. m., by Detective Brian Muldoon who interviewed appellant. Detective Muldoon was told by Detective Chitwood that appellant was advised of his constitutional rights and was shown the interview sheet which appellant signed waiving those rights before he resumed the questioning. From 5:23 a. m. to 6:50 a. m., that same morning, appellant gave the statement which he has challenged. During appellant's interview, appellant did not display any signs of physical impairment nor did appellant appear to be under the influence of drugs or medicine. Appellant was not subjected to physical or psychological coercion or overbearing by the police.

Appellant was rearrested and charged with Genevieve Meier's murder after the victim died. However, the second statement elicited from appellant at this time, which was with some minor exceptions the same as appellant's first statement, was ordered suppressed by the court. From the record, it appears that the suppression court suppressed the second statement because the police did not notify appellant's attorney that he was being questioned after appellant's initial arrest. This appeal, however, only involves the admissibility of the first statement. At no time has appellant challenged the lawfulness of his arrest.

█ Appellant contends that the content of the statement was not his. The prosecution's evidence however established that the statement was given by appellant. The issue is one of credibility and there is no basis to disturb the factfinder's resolution of the issue.

The same can be said concerning appellant's argument that one of the detectives broke a tooth in his mouth, as a result of which he was seen by a dentist several weeks later at the detention center. The prosecution's evidence was in direct contradiction to appellant's. Moreover, defense counsel and the prosecution stipulated that the records of the detention center did not indicate that any treatment had been given to appellant. The credibility matter was for the factfinder to resolve.

■ At the time of his arrest appellant had completed the eleventh grade, was eighteen years of age, and was in sound physical and mental condition. Under these circumstances, there is no basis for concluding, as a matter of law, that appellant's waiver and his statement were not knowingly, intelligently and voluntarily given.

Judgment of sentence affirmed.

EAGEN, C. J., did not participate in the consideration or decision of this case.