# Commonwealth v. Harter

*Frederick D. Lingle, District Attorney,* for Commonwealth.
*Peter P. Griffin, Public Defender,* for defendant.

BROWN, *P.J.,* April 24, 1981—Defendant was found guilty by a jury of murder of the first degree. His trial began on February 2, 1981 with jury selection and concluded on Friday, February 6, 1981 with the return of the aforesaid verdict. Defendant, in addition to his normal post-verdict motions, has filed a request for a new trial based on alleged outside improper influences to which he contends the jury was exposed.

Defendant's first complaint is that at its evening meal on February 5, 1981 the jury was exposed to various items of conversation which were prejudicial to him. The jury had been sequestered

throughout the trial at the Fallon Hotel located approximately one and one-half blocks from the courthouse. The procedure arranged by the court for the jury to eat involved the panel's being fed in a private dining room at the Fallon in the presence of two tipstaves. These two tipstaves, Mr. John Kessinger and Mr. John Barry ate with the jury in the private dining room; Mr. Kessinger and Mr. Barry also shared a room at the Fallon where they could monitor and control access to the panel during the evening when its members were in their rooms. During their sequestration, the jurors were denied total access to the community, including newspapers, television, radio, and their families.

At the evening meal in question, Mr. Kessinger was seated at the end of a long rectangular table at which all the jurors and alternates were seated. Mr. Barry was seated at the opposite end of the table. The remaining 12 jurors and four alternates were seated along both sides of the table. Immediately to Mr. Kessinger's left was a juror, Thomas Shaffer. Next to Mr. Shaffer was either Ann Miller a juror, or possibly another male juror which would have meant that Ann Miller then was seated as the third person on Mr. Kessinger's left. Immediately to Mr. Kessinger's right was a juror, Joseph Dicello. The next person to his right was either an alternate juror, Jayne Irwin, or a juror, Guy Confer. Again, the jurors are somewhat uncertain as to whether Mrs. Irwin was seated as the second or third person from Mr. Kessinger's right. In any event it would appear that Mrs. Irwin, an alternate juror, and Mrs. Miller, a juror, were seated directly across from one another so that either they were both seated as the second persons on both sides of Mr. Kessinger or as the third persons on both sides of Mr. Kessinger.

During the course of the evening meal it is defendant's contention that Mr. Kessinger improperly said something to the effect that defendant had a prior record or was well known at the courthouse. This allegation is based on the testimony of the alternate juror, Mrs. Irwin, who stated that during the meal Mr. Kessinger said "Everybody over there knows him." Also, Mrs. Miller testified that Mr. Kessinger said that defendant was well known in the courts. Mr. Kessinger denies any such statements and likewise Mr. Shaffer and Mr. Dicello denied that any such conversations were had during the course of that meal. Obviously the court is in a perplexing situation where there is considerable disparity between the jurors' testimony as to what was said and what was recalled. After a careful and extensive consideration of the testimony, the court concludes that the evidence does not support a finding that Mr. Kessinger made any statements during the meal alluding to defendant, his having a prior record, or his being well known at the courthouse.

In analyzing Mrs. Irwin's testimony, her recollection that Mr. Kessinger said that everybody over there knows him, even if accepted as accurate, has been given considerably more meaning than the statement itself would allow. The assumption that the "him" in that statement referred to defendant has no justification in any of the conversation that preceded or followed it. Both Mrs. Miller and Mrs. Irwin appear sure that defendant's name was not mentioned, yet they feel they were justified in concluding that defendant was being referred to. While the court does not doubt their sincerity in this assumption, there is no basis on which to conclude that the assumption was justified from what was said at the table. The court has to rely on facts and

cannot just simply conclude that such a reference occurred based upon the subjective feelings of either Mrs. Irwin or Mrs. Miller. It would further appear that Mrs. Irwin erroneously assumed that Mr. Kessinger in the alleged statement was referring to the courthouse and also erroneously assumed that the fact that someone may have been known at the courthouse would necessarily imply that the person had a criminal record.

Mrs. Miller's recollection is similar to that of Mrs. Irwin except that she recalls the statement being made that he was well known in the court. She had no recollection of the defendant's name coming up in the course of the conversation and is really unable to say why she concluded that she felt that defendant was being discussed in this context. Again as with Mrs. Irwin, the court believes that Mrs. Miller is sincere in her belief that she felt that defendant was being discussed and in circumstances which suggested that he had a prior criminal record. However, as with Mrs. Irwin, the court cannot find that such a belief was justified.

In addition to the alleged conversation regarding defendant, defendant also contends that there was a prejudicial conversation as to a murder trial held in November, 1980 involving a defendant by the name of Merrifield. Both Mrs. Miller and Mrs. Irwin recall a discussion initiated by Mr. Kessinger to the effect that Mrs. Merrifield would never serve a day in her life and some other comments regarding Mrs. Merrifield being on bail at the present time. Again Mr. Kessinger denies any such statements. Mr. Shaffer and Mr. Dicello also deny such a conversation. Mr. Shaffer testified that a discussion of the Merrifield case occurred when one of the jurors asked Mr. Kessinger if he had ever been locked up with a jury

before and Mr. Kessinger indicated that he had been locked up and in sequestration during the Merrifield trial.

Mr. Shaffer further testified that during the course of the meal one of the other jurors questioned why prior convictions or arrests of a defendant were not used at trial to which Mr. Shaffer responded that this would constitute a violation of a defendant's constitutional rights and would probably be a basis for a retrial. Mr. Shaffer speculated that this subject came up because of the testimony immediately prior to the evening meal when upon questioning by defense counsel, Roy Glossner, a corrections officer at the Clinton County Jail had testified that on his seeing defendant on the day of his arrest he said hello to defendant and inquired if he was here again from which it may have been inferred that defendant had been in jail prior to the particular incident. According to Mr. Shaffer's testimony Mr. Kessinger did not participate in this part of the conversation which occurred between him and the other juror.

At the beginning of the trial, the jury panel was instructed by the court that any attempts to discuss the case or defendant with them were to be immediately brought to the court's attention. Unfortunately, neither Mrs. Miller nor Mrs. Irwin attempted to do this, so that the court was prevented from doing anything to forestall the problem now at hand.

Following the jurors' evening meal on the night in question, court was reconvened and defendant took the stand to testify. During direct examination he was asked if he understood his Miranda rights when they were read to him by the interrogating officers after his initial apprehension as a suspect.

To this question he replied that he did not understand them because Miranda warnings had never been read to him before. This response was somewhat of an untruth as the Commonwealth presented several witnesses at the post-trial hearing to indicate that defendant's Miranda rights had been read to him on a number of occasions in the past during prior arrests.

Mrs. Irwin testified that when Mr. Harter gave this response at the trial, she observed Deputy Sheriff Santone who was sitting across the courtroom from her laugh and then turn around and talk to someone behind him whereupon they both laughed. She interpreted Deputy Santone's actions as an indication that he knew that defendant was lying when he said he had never been advised of his rights. From this she also inferred that defendant had a prior criminal record. Mrs. Irwin as an alternate juror was seated outside the jury box and directly in front of the jury. Her chair was immediately to defendant's left while he was testifying, and Deputy Santone would have been seated at somewhat of an angle about thirty feet across the room from her. Her view of that side of the courtroom would have been somewhat obstructed, as defense counsel was standing directly in front of the witness box when questioning defendant and would have at times been standing between her and Deputy Santone. However, the court accepts her testimony that despite these obstructions she was able to view Deputy Santone at the time of the questioning.

Mrs. Miller verified in substance Mrs. Irwin's observations in that she too observed Deputy Santone make a gesture with his arms and smile at the time defendant gave the testimony in question. One other juror noticed Deputy Santone at this time react in a similar fashion and that would be juror

No. 1, Marion Clark. None of the other jurors observed Deputy Santone at this time.

During defendant's testimony the court observed no extraneous noises or gestures coming from any of the spectators in the courtroom. By necessity the court's attention was directed toward the questions and answers being developed, and it would probably have required an audible disturbance of some sort to divert that attention. Counsel apparently did not notice or hear the gesture as no objection was registered. The remaining jurors likewise did not have their attention to the testimony so diverted.

Deputy Santone testified that he was in the courtroom when defendant testified and recalls the particular testimony regarding his never having had his rights read to him before this arrest. He does not recall responding to it any any way although he may have turned around and talked to a person behind him at that time.

## DISCUSSION AND CONCLUSIONS OF LAW

In seeking a new trial, defendant is essentially relying upon that principle of law which states that minimal standards of constitutional due process guarantee to a defendant a fair trial by a panel of impartial and indifferent jurors, and the principle that impartiality is a state of mind and that a verdict must be induced only by the evidence and arguments in open court and not by any outside influence: Com. v. Stewart, 449 Pa. 50, 52, 295 A. 2d 303, 304 (1972); Com. v. Santiago, 456 Pa. 265, 266, 318 A. 2d 737, 738 (1974). This is an uncontroverted rule of law and if such outside influences do permeate the jury's verdict, obviously a new trial should be granted.

In support of his position, defendant initially ar-

gues that Mr. Kessinger, a court tipstaff, improperly referred to him either directly or indirectly as having a prior criminal record which constituted an outside influence on the jury's deliberations. As previously noted, the court rejects this factual contention for the reasons previously mentioned in this opinion. The court is satisfied that the weight of the evidence including Mr. Kessinger's testimony and the testimony of the other jurors that defendant was not referred to by name during the course of the meal in question nor could any of the conversation reasonably have been interpreted as referring to defendant. As noted the court does not question the sincerity of Mrs. Miller or Mrs. Irwin in their assessment of that conversation; however, the court cannot operate strictly on principles of faith and subjective interpretation in resolving this factual issue. Accordingly, the court concludes that Mr. Kessinger did not directly or indirectly engage in conversation either with the jurors or in their presence which tended to suggest that defendant had a prior arrest or conviction record.

With regard to the contention that Mr. Kessinger improperly discussed the prior Merrifield murder trial, the court also rejects that contention. The only conversation of any note emanating from Mr. Kessinger about that trial involved his relating that he had been sequestered with that particular jury panel. The mere reference to that trial in that context would not operate as an improper outside influence to prejudice or taint the jury's deliberations in the present case.

The court also rejects the contention based upon Mrs. Miller's testimony that Mr. Kessinger had instructed the jury to disregard what he had said because it would be grounds for a mistrial. None of

the other jurors heard this statement being made and the court finds this testimony on the subject to be of sufficient credibility so as to prevent the conclusion that the jurors were so admonished.

The problem presented to the court in this regard as to what was said at the evening meal in question is a troublesome illustration of the principle that different people listening to the same words will interpret them differently and will have a different recollection as to what was said. During the course of every jury trial, the court has occasion to instruct jurors on this principle with regards to witnesses who gave conflicting testimony, and certainly this principle would apply to twelve jurors and four alternates who heard bits and pieces of several conversations. The problem is also highlighted in this case by the fact that both Mrs. Miller and Mrs. Irwin were not participants in the conversations but were merely picking up parts of it and interpreting it in a fashion other than which it was intended. This is a hazard that anyone who is on the perimeters of but not a participant in a conversation will experience. Unfortunately in the present case, both Mrs. Miller and Mrs. Irwin took the conversation they were hearing in its worst light.

Having determined that the conversations complained of did not occur as alleged, the court is next faced with the question of whether Mrs. Miller's subjective impressions of these conversations is enough to warrant a new trial because of potential prejudice injected into her participation in the jury deliberations. With regard to Mrs. Irwin, the court does not have this concern since as an alternate juror she did not participate in the deliberations and even if she were subjectively prejudiced by what she thought she heard, it would have no bear-

ing on the jury's verdict. However, with Mrs. Miller, the matter must be assessed in a different light.

In resolving this issue it is not entirely without significance that there were certain things that happened in the course of the trial which could have reasonably been expected to induce one or more jurors to be wondering about whether defendant had a prior arrest or conviction record. These particular inducements were provided by defendant in several ways. The first of these involved defense counsel's cross-examination of Roy Glossner, a corrections officer, who testified that defendant had admitted to the killing on the date of his arrest while he was incarcerated in the Clinton County Jail.

Prior to this testimony being presented, it was made apparent to the court that during the course of this conversation, the words "Here again" were said either by Mr. Glossner or by defendant. In the interest of avoiding prejudice to defendant by the use of those words, the district attorney was instructed by the court to insturct the witness not to use these words in his testimony on direct examination. Defense counsel has somewhat distorted this admonishment by suggesting that the district attorney improperly instructed Mr. Glossner to eliminate this part of his testimony. This is not true since this instruction came from the court in an effort to avoid the prejudice which defendant now wishes to advance in support of a new trial. Defense counsel, however, elected on cross-examination of Mr. Glossner to elicit the words "Here again" as part of an impeachment effort based upon Mr. Glossner's preliminary hearing testimony. Defense counsel as a matter of trial tactics may well have been justified in concluding that it was more important to

attempt to impeach Mr. Glossner based upon his preliminary hearing testimony as to who used the words "Here again" than it was to avoid the appearance of defendant's having a prior criminal record. But having made that election, it can reasonably be observed that the jurors could well have concluded that defendant did in fact have such a prior record.

A second in-court way defendant's prior record could have entered the case occurred during the course of his testimony when he said that he had never had his Miranda rights read to him before this case. This was an untruth and by saying this he took a chance that the jury might disbelieve this statement on the basis that he had previously been the focus of a criminal investigation or even worse that he had previously been convicted of criminal conduct. This observation would have particular merit when one considers the earlier cross-examination of Roy Glossner developing the fact that defendant had previously been in jail. Having taken such a risk he of course must bear the consequences of it.

The significance of these trial tactics by defendant to the present problem suggests that these in-court happenings could well have primed the jury's thoughts on the subject of prior criminal conduct. This could then explain the juror inquiry at the evening meal in question as to the non-use of a prior criminal record as well as getting Mrs. Miller thinking about this subject and encouraging her assumption that Mr. Kessinger was talking about defendant having a prior criminal record. To the extent that this is true it can be observed that such an attitude in any particular juror was developed during the evidentiary phases of the trial and not from any outside influences as contended by defendant.

In evaluating this aspect of the case, no appellate authority has been brought to the court's attention dealing with this precise problem and the possibility of a juror's wondering about inadmissible evidence because of the particular manner in which the defense was presented. However, the court believes that in most cases when this occurs, defendant must bear the risks of his trial strategy even if that includes the possibility of a juror's thinking about matters which are inadmissible and perhaps prejudicial to him.

The second aspect of defendant's argument relates to Deputy Santone's conduct during defendant's testimony. This is also a somewhat elusive problem to resolve. Initially, the court would note that independent of Deputy Santone's gestures, there is no indication that he engaged in any audible noises or laughter. Such laughter or noises would have most likely been observed or heard by the court as well as by counsel and other members of the jury. It seems to be merely an item of happenstance that Mrs. Miller's, Mrs. Irwin's and Mrs. Clark's attentions were somehow focused on Deputy Santone rather than on defendant when this gesture occurred. However, after considering the circumstances and even concluding that Deputy Santone did smile or gesture and turn and have a conversation with someone behind him in such a manner as to suggest that he did not believe defendant's testimony, the court is satisfied beyond a reasonable doubt that this was not prejudicial error to defendant's case.

In making this assessment, the court again refers to the fact that the suggestion that he had a prior criminal record or had been previously arrested emanated in part from defendant's own tactics in

defending the case and it may be that the jurors who observed Deputy Santone were motivated in their assessment of his reaction by what was already in the record.

In addition, the court notes that even though the trial transcript has not been transcribed, the Commonwealth had a considerable amount of very strong circumstantial evidence pointing to defendant's guilt including several admissions by defendant to third parties who were not police officers which would strongly suggest that he had committed the crime as well as eyewitness testimony placing him near the scene of the crime with a rifle on the night it was believed that the decedent was shot. Taking into account the substance of the Commonwealth's evidence although it consists entirely of circumstantial evidence and defendant's own statements, the court does not believe that this one gesture in the course of a trial consuming over fifteen hours of testimony to be significant in affecting the jury's verdict.

One other matter that deserves attention relates to the court's questioning of the jurors immediately after the verdict was returned. At this time Mrs. Miller was asked if what she thought she saw or heard had any effect on her deliberations as a juror. Her answers were somewhat equivocal in stating she was so affected and then stating that she tried to put the incidents out of her mind. This line of questioning was in error as the court inadvertently permitted Mrs. Miller to impeach the verdict. The law is well settled that a juror is not competent to do this and may not testify as to what transpired in the jury room or what effect the alleged outside influence may have had on the verdict: Com. v. Sero, 478 Pa. 440, 387 A. 2d 63 (1978); Welshire v.

Bruaw, 331 Pa. 392, 200 Atl. 67 (1938). Accordingly, Mrs. Miller's efforts to describe the effect any of the alleged transgressions had on the verdict would not be allowed and must be ignored in resolving the issues raised by defendant.

## ORDER

And now, April 24, 1981, based upon the foregoing opinion, it is hereby ordered that defendant's motion for a new trial filed February 10, 1981 be dismissed and the requested relief be denied, and further that the trial transcrpit be prepared and filed of record so that defendant's motion for a new trial and arrest of judgment filed on February 17, 1981 can be scheduled for argument.