J-A27041-23

2024 PA Super 101

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JOSEPH BERNARD FITZPATRICK, III | : | No. 554 MDA 2023 |

Appeal from the Order Entered March 20, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002534-2014

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED: MAY 17, 2024**

Appellant, the Commonwealth, appeals from the March 20, 2023, order entered in the York County Court of Common Pleas. The order granted in part the Commonwealth's motion *in limine* but denied the Commonwealth's request to present certain evidence and testimony in the case against Defendant, Joseph Bernard Fitzpatrick, III, regarding the death of his wife, Annemarie. After a careful review, we reverse the part of the order denying the Commonwealth's requests and affirm the remaining part.

The facts of the case, as set forth by the Pennsylvania Supreme Court[1], are as follows:

_____

[*] Former Justice specially assigned to the Superior Court.
[1] This case first went to trial in 2014. In 2021, the Pennsylvania Supreme Court ordered a new trial. **Commonwealth v. Fitzpatrick**, 255 A.3d 452, (Pa. 2021). The instant appeal is regarding a pre-trial motion in the new trial.

On June 6, 2012, Fitzpatrick and Annemarie were riding on an all-terrain vehicle ("ATV") through a deep part of Muddy Creek, a tributary of the Susquehanna River that runs near their home in Chanceford Township, York County, Pennsylvania. According to Fitzpatrick, at some point during their trek, the vehicle flipped backwards and tossed both riders into the creek. Although Fitzpatrick managed to climb out of the water relatively unscathed, in his version of events, Annemarie could not. Fitzpatrick claimed that he called 911 after he initially was unable to locate Annemarie in the water. While on the line with a dispatcher, Fitzpatrick allegedly saw Annemarie's body floating nearby on the side of the creek opposite from where he was standing.

Pennsylvania State Police ("PSP") troopers and emergency medical technicians ("EMT") responded to the scene. Fitzpatrick— who presented no obvious signs of injury and refused medical treatment—told a PSP trooper that, when he located Annemarie, he dove into the creek, removed her body from the water, and began to perform CPR. The EMTs took over the resuscitation efforts. Once the EMTs were able to restart Annemarie's pulse, they immediately transported her to the local hospital. A short time later, Annemarie died. The York County Coroner's Office determined that the cause of Annemarie's death was drowning. Upon further determining that an autopsy was not necessary at that time, the Coroner's Office released Annemarie's body to a mortician, who embalmed her remains.

At first, the PSP investigators uncovered no evidence of foul play. By all initial accounts, it appeared to the authorities that Annemarie had died in an ATV accident on June 6. Two days later, things changed dramatically. On June 8, 2012, the PSP received a telephone call from Rebekah Berry, one of Annemarie's co-workers at Collectibles Insurance Services, a business that is located across the state line in Hunt Valley, Maryland. This call transformed the case into a murder investigation, with Fitzgerald being the lead suspect.

Berry told PSP investigators that her co-workers had found a day planner on Annemarie's desk. Annemarie had left a note in the day planner that read, "06/05/12. If something happens to me—JOE." Annemarie had personally signed the note. After reviewing the note, PSP personnel obtained access to Annemarie's password-protected work email account. The troopers discovered

that, at 10:30 a.m. on June 6, 2012, the day she died, Annemarie sent an email from her work email account to her personal email account, "feltonfitz@gmail.com." In the subject line of the email, Annemarie wrote, "if something happens to me." In the body of the message, Annemarie stated, "Joe and I are having marital problems. Last night we almost had an accident where a huge log fell on me. Joe was on the pile with the log and had me untying a tarp directly below."

That same day, PSP investigators interviewed Fitzpatrick at a PSP barracks. Fitzpatrick related that he and Annemarie went to Muddy Creek to have a waterside picnic in celebration of their wedding anniversary. During dinner, Fitzpatrick drank three beers. Annemarie had a glass of wine. After they ate, Fitzpatrick and Annemarie wanted to start a campfire, but they had left the propane torch needed to ignite the fire back at their house. They climbed onto the ATV, with Annemarie in the driver's position and Fitzpatrick the passenger. Annemarie, who, according to Fitzpatrick, was inexperienced in driving ATVs, started toward the house to get the torch, with Fitzpatrick behind her.

Fitzpatrick told the PSP that, due to his wife's limited ability operating ATVs, he had to reach around Annemarie to assist her with the controls. He explained that he reached around her left side to shift gears and around her right side to throttle the vehicle. Fitzpatrick claimed that, when he twisted the throttle, the ATV shot forward and flipped them both backwards into the water.

As the interview progressed, however, Fitzpatrick's version of the events began to change. For instance, he retracted his statement that he had shifted the gears and twisted the throttle. He proceeded now to state that he believed that it had to be Annemarie who did so, because he no longer could remember reaching around and assisting her. He claimed that his memory of the accident was limited, and that he could only recall driving into the creek in a diagonal direction.

Regarding the accident, Fitzpatrick explained that the front of the ATV rose slowly—more like a tilt than a rapid ascent, as one might see when a driver performs a wheelie—before it flipped over backwards. He then told the troopers that, when he emerged from the water, the rear tire of the ATV was near his head. The vehicle was almost entirely submerged. He tried to move the ATV, but could not do so because so much of it was under water. Fitzpatrick

looked around but could not see any sign of Annemarie. After several minutes of searching for her, he placed the 911 call. He told the police that it was during the call that he spotted Annemarie's body floating near the opposite shore.

Fitzpatrick walked away from the incident relatively unscathed. He informed the troopers only that he felt some soreness in his legs. Otherwise, the accident that had caused Annemarie to drown had left him almost entirely uninjured.

Notably, Fitzpatrick told the PSP investigators that he and Annemarie were not experiencing any marital problems on or before June 6, 2012.

Meanwhile, on June 8, 2012, PSP troopers executed a search warrant on Fitzpatrick's residence. While on the property, the investigative team observed a large woodpile in a field behind the house. The stack of wood was partially covered by a blue tarp. On one side of the pile, there was clear evidence that a log had fallen off the pile. The investigators located an impression in the mud that they believed likely was caused by a fallen log, which also was surrounded by loose bark. These findings corroborated Annemarie's June 6 email message.

During the initial investigation on the night of Annemarie's death, a trooper had observed Annemarie's cell phone on a picnic table near the creek where she drowned. During the execution of the search warrant on June 8, 2012, PSP investigators tried to locate that phone, but were unsuccessful. They asked Fitzpatrick about the phone, but he claimed that he did not know where it was located. He suggested that he and his brother might have thrown it in the garbage when they were cleaning up the residence during the two days following Annemarie's death. Fitzpatrick told the troopers that he would let them know if he found the phone. This turned out to be untrue. As noted below, Fitzpatrick concealed the phone in order to cover up the fact that Annemarie had learned that he was engaged in an extramarital affair.

On June 9, 2012, three days after Annemarie's death and in light of the newly uncovered suspicious circumstances surrounding the drowning, authorities decided to have Annemarie's body autopsied. Barbara Bollinger, M.D., a forensic pathologist, conducted the autopsy at the Lehigh Valley Hospital. Dr. Bollinger determined that Annemarie had drowned, and

concluded that the circumstances surrounding her death were suspicious. However, Dr. Bollinger could not determine the manner of death with any degree of certainty. During the examination of Annemarie's body, Dr. Bollinger found injuries to the head, neck, torso, buttocks, right and left hands, right and left arms, right and left legs, right elbow, right forearm, left thigh, left knee, and lower back. Additionally, one of Annemarie's ribs had been broken. Notwithstanding Fitzpatrick's assertion that Annemarie had consumed a glass of wine during dinner on the night she died, a toxicology report showed no traces of alcohol or drugs in her system.

As the investigation unfolded, PSP troopers continued to suspect that Annemarie's death might not have been an accident. Investigators learned that much of Fitzpatrick's statement to them was not truthful. For instance, contrary to his claim that he and Annemarie were not experiencing marital problems, Fitzpatrick had been engaging in an affair with a woman named Jessica Georg. In emails and other communications, Fitzpatrick told Georg that he loved her and that he was going to end his marriage with Annemarie in order to be with her.

On June 2, 2012—four days before Annemarie died—Georg told Fitzpatrick that, if he wished to share a relationship with her, he would have to end his marriage. Fitzpatrick agreed, and he committed to discussing the matter with Annemarie. According to Georg, Fitzpatrick decided that, on the night of June 6, he was going to discuss a separation with Annemarie, and this was to be followed by a divorce. But on June 7, Fitzpatrick abruptly directed Georg to delete any Facebook messages between them and told her that the police might be interested in speaking with her. Fitzpatrick later admitted that he had hidden Annemarie's cell phone (the one that PSP troopers had searched for on his property) in an effort to conceal the affair from authorities.

The PSP also learned that Fitzpatrick was the beneficiary of Annemarie's life insurance policy. Under the policy's terms, upon Annemarie's death, Fitzpatrick would receive over $1.7 million dollars. Eventually, investigators searched Fitzpatrick's personal computer and reviewed his internet activity. They found that, on June 1, 2012—five days before Annemarie's death—Fitzpatrick had conducted an online search for "life insurance review during contestability period." Notes of Testimony ("N.T."), 5/4/2015-

- 5 -

5/13/2015, at 918. Four days later, he performed an online search for "polygraph legal in which states." *Id.*

Corporal Andrew Thierwechter, a PSP accident reconstructionist, attempted to reenact the accident in Muddy Creek according to Fitzpatrick's version of the events. Using forensic mapping, measurements, and simulations with an actual ATV, Corporal Thierwechter determined that, had the incident occurred in accordance with Fitzpatrick's account, both he and Annemarie would have been subjected to similar forces when the ATV flipped over. In Corporal Thierwechter's view, either both riders would have suffered similar injuries, or neither would have been injured at all. Corporal Thierwechter concluded that there was no reasonable way to explain how Annemarie could have suffered such significant injuries while Fitzpatrick suffered essentially none. Nor could he ascertain any reasonable explanation for how Fitzpatrick awoke next to the submerged ATV while Annemarie ended up on the other side of the creek.

Nearly two years after Annemarie's death, the PSP charged Fitzpatrick with homicide. The case originally was assigned to the Honorable Gregory M. Snyder. Prior to trial, Fitzpatrick filed an omnibus pre-trial motion, asserting, *inter alia*, that both the note written in Annemarie's day planner and the email that she had sent from her work email account to her private account were inadmissible hearsay and were not otherwise admissible under any established hearsay exception. The Commonwealth conceded that both statements were hearsay, but argued that the statements nonetheless were admissible as substantive evidence under the state of mind hearsay exception. *See* Pa.R.E. 803(3). Judge Snyder agreed with the Commonwealth, ruling that both statements were admissible. Thereafter, Judge Snyder was reassigned to the Family Division of the York County Court of Common Pleas. Fitzpatrick's case was transferred to the Honorable Richard K. Renn for trial.

From May 4 through May 13, 2014, Fitzpatrick was tried for murder before a jury. Of critical importance to the Commonwealth's case against Fitzpatrick were the note, the email, and the testimonies of Dr. Bollinger and Corporal Thierwechter. Given its particular relevance here, Dr. Bollinger's testimony requires some further elaboration. Dr. Bollinger testified that, to a reasonable degree of medical certainty, the cause of Annemarie's death was drowning. While this conclusion was not

disputed by the parties, the manner of death remained a central point of contention. With the assistance of charts and diagrams, Dr. Bollinger detailed for the jury the more than twenty-five injuries suffered by Annemarie. Dr. Bollinger opined that all of these injuries were the result of blunt force trauma. However, she explained as well that such trauma may have been inflicted during the resuscitation attempts or during the embalming process, which occurred prior to the autopsy. On cross-examination, Dr. Bollinger stated that the existence of injuries caused by blunt force trauma does not, *ipso facto*, mean that a criminal act caused those injuries.

At trial, Dr. Bollinger could not offer a definitive opinion on the manner of death. She explained that Annemarie's injuries *could have* been caused by being held underwater until she drowned. Because Fitzpatrick was the only person in the water with Annemarie, only he could have done that to her. In Dr. Bollinger's view, that made the death at least suspicious. However, Dr. Bollinger could not opine whether that, in fact, is what happened. She testified that none of the more than twenty-five injuries were indicative of any specific type of assault. Instead, she opined, Annemarie's injuries were "consistent with an accident," N.T. at 547, and that it was "possible"" that those injuries were consistent with being held under water. *Id.* at 564. On re-cross-examination, defense counsel asked Dr. Bollinger the following question: "Dr. Bollinger, do you *equally* agree that all of the injuries that you've described in depth here over the last few questions could also be caused as a result of an ATV accident?" *Id.* at 564-65 (emphasis added). Dr. Bollinger responded: "That is also possible." *Id.* at 565.

Fitzpatrick testified in his own defense. As he did when interviewed by PSP investigators, Fitzpatrick maintained that Annemarie had died in an ATV accident. Fitzpatrick told the jury that Annemarie must have inadvertently placed the vehicle in the reverse gear, such that when she accelerated the ATV flipped backwards, sending them both into the water. Fitzpatrick denied killing Annemarie intentionally.

*Commonwealth v. Fitzpatrick*, 255 A.3d 452, 459-63 (Pa. 2021).

The jury found Defendant guilty of first-degree murder. In September 2015, after post-sentence motions were submitted and oral argument was

held on the motions, the trial judge determined that the evidence was insufficient to support a murder conviction and granted Defendant a judgment of acquittal. In 2017, we reversed the trial court's grant of Defendant's motion for judgment of acquittal. Once Defendant's sentence was reinstated, he again appealed to this Court contesting the admissibility of two pieces of evidence; the note and the email. In 2019, we held that the evidence was properly admitted.

The Defendant filed a petition for allowance of appeal which the Pennsylvania Supreme Court granted. In 2021, the Pennsylvania Supreme Court found the note and email to have been admitted in error and ordered a new trial. The case was remanded to the York County Court of Common Pleas and by order and opinion dated June 7, 2022, the trial court inexplicably released defendant on nominal bail.[2] Also in June 2022, the Commonwealth

_____

[2] The Commonwealth devotes several pages of the argument section in its brief to establish the trial court judge's "pattern of bias against the Commonwealth and in favor of seeing defendant acquitted and discharged from incarceration." Appellant's Br. at 32. The Commonwealth noted that it anticipates filing a recusal motion at the conclusion of the instant appeal. *Id.* at 35 n.169. While the Commonwealth states that it does not raise bias lightly or merely because it received an adverse ruling, *Id.* at 34, reasons the Commonwealth includes are that the trial court released Defendant from prison when "lacking jurisdiction," and released Defendant on nominal bail despite the charge being homicide. Appellant's Br. at 33-34. The trial court stated that it raised issues with the Commonwealth's evidence *sua sponte*, R.R. 1627, which the Commonwealth asserts resulted in the partial denial of the Commonwealth's motion *in limine*. Appellant's Br. at 34. The trial court stated in its order granting supervised bail on June 6, 2022, "We note that we do not consider ourselves bound by the Superior Court's finding that there
*(Footnote Continued Next Page)*

filed a motion *in limine* for the admission of, *inter alia*, demonstrative exhibits by Corporal Thierwechter and testimony from Dr. Caruso. A pre-trial hearing was held on the motion in January 2023 on the motions. On March 20, 2023, the trial court issued an order resolving the pre-trial motions. Relevantly, the trial court denied the Commonwealth's requests to present demonstrative exhibits by Corporal Thierwechter and testimony from Dr. Caruso. This appeal followed.

The Commonwealth raises two issues on appeal:

I. DID THE TRIAL COURT ERR IN DENYING THE COMMONWEALTH'S MOTION IN LIMINE AND THEREBY EXCLUDING EVIDENCE AND TESTIMONY OF THE ATV EXPERIMENTS CONDUCTED BY CORPORAL ANDREW THIERWECHTER AND THE PENNSYLVANIA STATE POLICE?

II. DID THE TRIAL COURT ERR IN DENYING THE COMMONWEALTH'S MOTION IN LIMINE AND THEREBY EXCLUDING EVIDENCE AND TESTIMONY OF DR. JAMES CARUSO, AN EXPERT IN THE FIELD OF FORENSIC PATHOLOGY AND AQUATIC DEATHS, AS TO HIS OPINION CONCERNING THE MANNER OF DEATH FOR THE HOMICIDE VICTIM AND HIS REASONS FOR THAT OPINION?

Appellant's Br. at 4.

In reviewing the denial of the Commonwealth's motion *in limine*, our standard of review is as follows:

when reviewing the denial of a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. ***See Commonwealth v. Zugay***, 2000 PA Super 15, 745 A.2d 639 (Pa.Super. 2000) (explaining that because a motion *in limine* is a

---

was sufficient evidence at trial to support the original verdict." R.R. 1606. The Commonwealth asserts that the "pattern and tone exhibited by the trial court's rulings strike a tone of advocacy rather than dispassionate reflection."

procedure for obtaining a ruling on the admissibility of evidence prior to trial, which is similar to ruling on a motion to suppress evidence, our standard of review of a motion *in limine* is the same of that of a motion to suppress). The admission of evidence is committed to the sound discretion of the trial court and our review is for an abuse of discretion.

***Commonwealth v. Kane***, 188 A.3d 1217, 1229 (Pa. Super. 2018) (quoting ***Commonwealth v. Stokes***, 78 A.3d 644, 654 (Pa. Super. 2013) (citations and brackets omitted)).

Specifically, the Commonwealth's first issue is that the trial court abused its discretion in precluding the admission of the demonstrative experiments because they were substantially similar to the version of events provided by Defendant and that if there is a discrepancy between Defendant's statements and the results of the experiments, such would affect the "weight of the evidence and not admissibility." Appellant's Br. at 30. Defendant's position is that the ATV experiments by Corporal Thierwechter were "poorly theorized, organized and performed," and "bore no similarity to the conditions or event being analyzed." Appellee's Br. at 8.

As a general rule, "the threshold inquiry with admission of evidence is whether the evidence is relevant." ***Commonwealth v. Cook***, 952 A.2d 594, 612 (2008) (citations omitted). Our rules of evidence state that "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Pennsylvania Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make

a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401.

Further, this Court has provided that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Akhmedov*, 216 A.3d 307, 316 (Pa. Super. 2019).

However, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Specifically, with respect to the admission of demonstrative evidence, we are guided by the following principles:

> The decision to admit the results of experiments, like the decision to admit other forms of evidence, is ordinarily one for the trial court's discretion, reviewable only for an abuse of discretion. *Commonwealth v. Sero*, 478 Pa. 440, 449, 387 A.2d 63, 68 (1978). "Authority is unanimous that test results of experiments are admissible if the conditions under which the experiment was conducted are 'substantially similar' to the conditions involved in the commission of the crime; to attain identical conditions is often impossible." *Commonwealth v. Sero, supra*, 478 Pa. at 449-450, 387 A.2d at 68 (results of a neutron activation tests on scarf worn by victim introduced to discredit defendant's version of the shooting held admissible).
> The requirement of similarity of conditions is a relative one: "[p]erfect identity between experimental and actual conditions is neither attainable nor required . . . . [d]issimilarities affect the weight of the evidence, not admissibility." *Ramseyer v. GM Corp.*, 417 F.2d 859, 864 (8th Cir.1969). Thus, the general rule regarding corroboration by results of experiments is that unless

- 11 -

some other exclusionary rule is violated, the results of experiments may be admitted into evidence when the circumstances under which the experiment was performed were sufficiently similar to the event in question to throw light on a material point in controversy and to assist the jury in arriving at the truth rather than to confuse the jury, inflame passions or prejudices, or unnecessarily delay proceedings.

***Commonwealth v. Davis***, 492, 554 A.2d 104, 109 (1989).

The trial court focuses its analysis on those aspects of the experiment that conflicted with Defendant's theory of what happened, ignoring the probative aspects that support the Commonwealth's theory. The trial court concludes that because the experiments do not conform to Defendant's version of events, the experiments necessarily do not accurately replicate the "actual events." Tr. Ct. Op. at 8 (comparing the experiment to "Defendant's account of the actual incident" and suggesting the jury will have to guess which experiment was closest to "the actual events.").

For example, the trial court indicates that instead of human riders, mannequins were used, Tr. Ct. Op. at 8, but fails to consider in its analysis that the mannequins were of the same size and weight as Defendant and his wife. The trial court states that multiple reenactments were done at varying speeds producing differing results, and none produced the tire marks that were found at the actual scene of the incident. ***Id***. The trial court fails to recognize the probative value in the fact that no reenactment supports Defendant's theory of the case; it necessarily has a tendency either to make the Defendant's "facts" less likely or the Commonwealth's experiments less

credible. Next, the trial court notes the varying speeds performed during the experiment and finds this to weigh against similarity. Tr. Ct. Op. at 8. The record reflects that Dr. Fisher, Commonwealth expert in biometrics, acknowledged that the speed of the ATV on the night in question was an unknown variable. N.T., 5/12/15, at 1130. However, that was the reason for performing six different experiments; to test various speeds and forces to determine "which speeds provided kinematics most consistent with Mr. Fitzpatrick's account." *Id*.

Further, the trial court uses as factors weighing against the finding of "sufficiently similar" conditions that the reenactment was not conducted at the same time of day that the incident happened and that it was "unknown whether the water conditions were the same as on the night in question." Tr. Ct. Op. at 7-8. However, "[p]erfect identity between experimental and actual conditions is neither attainable nor required . . . . [d]issimilarities affect the weight of the evidence, not admissibility." *Ramseyer, supra*. To the extent the conditions were unknown, the trial court abused its discretion in using an unknown variable as weighing against a finding of similarity. Finally, the only factors the trial court found as weighing towards a finding of "sufficiently similar" were that the experiment was done with the actual ATV in question and at the actual location of the incident. Tr. Ct. Op. at 8.

The conditions between the actual occurrence and the experiment were sufficiently similar to warrant admissibility. The fact that the actual ATV used

on the day in question and owned by Defendant, not a comparable model,[3] was used for the experiment weighs more heavily towards a finding of sufficient similarity because the use of the *same* equipment removes speculation from the test that could cause confusion. Defendant argues that the use of the same ATV, as opposed to a new comparable model, makes the conditions *less* similar to the night in question because the original ATV was inoperable and "waterlogged," which would not have allowed it to float. Appellee's Br. at 14. However, this is a point Defendant's counsel developed through cross-examination; Defendant's counsel extensively questioned and attempted  to impeach Corporal Thierwechter regarding the credibility and efficacy of, *inter alia*, the mannequins used, the condition of the ATV, and the pully system to recreate Defendant's version of events. N.T., 5/7/15, at 670-75, 690-701.

As such, whether the experiment's features were accurate and effective to depict Defendant's version of events is a fact specifically placed at issue by Defendant. Thus, Defendant could "develop those points through cross-examination and then implore the jury to discount the [experiment's] value in

---

[3] We note that lower courts in Pennsylvania have found experiments using not the vehicle in question but one of the same year, make, and model to be "substantially similar" conditions. **See McGrorey v. Obermayer**, 14 Pa.D. & C.3d 335, 346 (C.P. Philadelphia 1978). While we are not bound by those decisions, there is an even stronger showing of sufficient similarity here because the vehicle was the *same*, not just similar. **See Morris v. Rickel Home Ctrs.**, 27 Phila. 293, 307 (1993).

depicting what happened." **Sullivan v. Werner Co.**, 253 A.3d 730, 754 (Pa. Super. 2021); **see also Davis**, 554 A.2d at 109.

Moreover, the location of the experiments was the same embankment of the same body of water where the victim drowned, also weighing heavily towards a finding of sufficiently similar. The dummies used to represent Defendant and his wife were substantially similar to Defendant and his wife because they were of similar weight and in the same positions as Defendant asserted, and were proportioned to have a center of mass distributed like a human body. N.T., 5/7/15, at 704. Defendant argues that the mannequins are useless because they do not have anthropomorphic features and could not react the way a human could. Appellee's Br. at 16. The record reflects that Dr. Fisher, who was present for Corporal Thierwechter's experiments, identified the mannequins used as "anthropomorphic." N.T., 5/12/12, at 1128. Regardless, as stated above, this issue may be explored by Defendant's counsel during cross-examination. Finally, the weather conditions were similar because the reenactment took place during the same season of the year the month following the victim's death.

We find that the trial court abused its discretion in holding that the differences between the Defendant's statements and the experiments bar their admissibility, as it is a consideration for the jury in determining the weight to be accorded to the experiment results. **See Davis**, 554 A.2d at 109 ("The extent to which the experiment may have deviated from the actual

conditions was a consideration for the jury in determining the weight to be accorded the experiment results and not a bar to its admissibility so long as the differences did not render the results of the experiment more confusing or misleading than probative.").

The Commonwealth's second issue is that the trial court erred by denying the Commonwealth's request to permit Dr. Caruso to state his opinion concerning the manner of death of the victim. The trial court's order allows Dr. Caruso to testify at trial as to *cause* of death, but not *manner* of death. Specifically, the Commonwealth argues that the trial court abused its discretion in excluding Dr. Caruso's testimony because it was rendered to the applicable standard regarding of manner of death determinations and with the certainty required by law. Appellant's Br. at 30. We agree.

It is important to note that Dr. Caruso was not part of the earlier proceedings in this case. As stated in the facts and procedural history, Dr. Barbara Bollinger was the forensic pathologist who testified at trial as an expert as to the victim's *cause* of death, drowning, which has never been disputed. However, Dr. Bollinger did not give any definitive opinion on the *manner* of death, although she found it "suspicious." In the trial court's opinion in support of its order acquitting Defendant, it states that one of the Commonwealth's deficiencies was that Dr. Bollinger,

> the pathologist[,] could not, to a reasonable degree of medical certainty, conclude that Annemarie Fitzpatrick died as a result of a homicide or accident. Thus, the jury had to rely on Corporal

- 16 -

Thierwechter's reconstruction and the circumstantial evidence of the note, e-mail, affair, Google searches, and insurance policies.

Tr. Ct. Op., 9/1/15, at 14-15.

The Commonwealth asserts that it retained Dr. Caruso as an expert because the court placed this "great emphasis on the need for a manner of death opinion of homicide." Dr. Caruso testified at the bail hearing in May 2022. The trial court indicated in the order and opinion granting the Defendant nominal bail that the fact that Dr. Bollinger could not state the manner of death was a "shortcoming," and that even after Dr. Caruso's testimony at the bail hearing, the court was not convinced that "the Commonwealth has met this burden, *by a substantial quantity of legally competent evidence*, that the *manner* of death was the result of an unlawful killing." Tr. Ct. Op., 6/6/22, at 6, 9 (emphasis in original).

The trial court's emphasis on the lack of a sufficient expert opinion on manner of death prompted the Commonwealth to engage Dr. Caruso to generate a report and testify as an expert. Dr. Caruso testified for a second time at the pre-trial motion hearing on January 10, 2023, as to cause of death and manner of death. In the trial court's opinion denying the Commonwealth's motion *in limine* to allow Dr. Caruso to testify at the new trial as to manner of death, the trial court relies on one sentence of quoted caselaw:

The cause of a death is usually established by the opinion testimony of medical experts, whereas a conclusion upon the question whether a death from 'external cause or violence' was 'accidental, suicidal, or homicidal,' may ordinarily be determined by a jury without the assistance of expert witnesses.

- 17 -

*Commonwealth v. Smith*, 808 A.2d 215, 229 (Pa. Super. 2002).

The trial court then states, "[u]nfortunately for the Commonwealth, however, the last sentence of that quote from **Smith** does not support the Commonwealth's argument for allowing its expert to testify as to the manner of death." Tr. Ct. Op. at 10. Moreover, the trial court's conclusion states,

> To put it in the terms of the authority cited by the Commonwealth, "a conclusion upon the question whether a death from external cause or violence was accidental, suicidal, or homicidal, may be ordinarily determined by a jury without the assistance of expert witnesses." That is clearly the case here. The Doctor's opinion on manner of death adds nothing to the jury's understanding of the main issue in controversy- whether this case is a homicide – beyond what the jurors can get from listening to other evidence which we expect to be presented in the case and drawing their own conclusions.

Tr. Ct. Op. at 14 (some quotation marks and citation omitted).

We disagree. The paragraph from which this quote was taken in **Smith** is attempting to distinguish between cause of death and manner of death, determinations which have different legal standards. **Supra**. Additionally, the quote uses the term "may." It is well established that "[t]he term 'shall' establishes a mandatory duty, whereas the term 'may' connotates an act that is permissive, but not mandated or required." **Lorino v. Workers' Comp. Appeal Bd.,** 266 A.3d 487, 493 (Pa. 2021).

In short, originally the trial court was dissatisfied with Dr. Bollinger's inability to definitively opine on manner of death, forcing the jury to have to rely on circumstantial and demonstrative evidence to determine manner of

- 18 -

death for themselves. The trial court now holds that Dr. Caruso's opinion on manner of death is prohibited because he is an expert, and manner of death determinations are for the jury to decide after listening to the evidence. Thus, we must determine if and when it is permissible for an expert to testify as to manner of death. We will begin by comparing the legal standards of cause of death and manner of death.

The Pennsylvania Supreme Court has explained,

Black's Law Dictionary, for example, defines cause of death as "[t]he happening, occurrence, or condition that makes a person die; the injury, disease, or medical complication that results directly in someone's demise." In isolation, "happening, occurrence, or condition" might hint at a broader inquiry than medical cause, but only in isolation. The more limited reference to "injury, disease, or medical complication"—with its suggestive use of the word "directly," which implies "but-for" causation—critically narrows the scope of the definition. Dorland's Medical Dictionary offers an equally strict definition of cause of death as "the injury or disease responsible for death." And our constrained reading of "cause of death" in harmony with these dictionaries finds more support in the same dictionaries' respective definitions of manner of death. Black's, for example, defines manner of death as "[t]he circumstances under which the cause of death arose, which jibes perfectly with Dorland's definition: "the circumstances under which a death occurs, *e.g.*, suicide or accident."

***Reibenstein v. Barax***, 286 A.3d 222, 233 (Pa. 2022). This court has stated,

The difference between cause and manner of death has been explained as such: this legislation makes a clear distinction between statements relative to the cause, and those concerning the manner, of a death; as to the former the statement is required to be definite,' but only "probable" to the latter. The reason for the distinction is obvious. The cause of a death is usually established by the opinion testimony of medical experts, whereas a conclusion upon the question whether a death from 'external cause or violence' was 'accidental, suicidal, or homicidal,' may

ordinarily be determined by a jury without the assistance of expert witnesses.

**Smith**, 808 A.2d at 229.

In synthesis, then, "cause of death" refers to the but-for cause of death such as the specific injury or disease. A medical expert must be able to definitively state the cause of death. "Manner of death," on the other hand, refers to the circumstances under which the death occurs—whether it was accidental, suicidal, or homicidal. In many circumstances, the jury comes to its own conclusion on manner of death based on the evidence[4], but if a witness does testify as to manner of death, the statements need only be "probable" because they are opinions, not facts.

Here, it is undisputed that the cause of death of the victim is drowning. Neither the trial court nor Defendant dispute that drowning was the cause of death. See Appellee's Br. at 26; Tr. Ct. Op. at 9. The issue is if the Commonwealth's medical expert can testify as to manner of death, i.e., homicide. The trial court and Defendant rely on **Griffin v. Univ. of Pittsburgh Med. Ctr.-Braddock Hosp**.[5] **See** Appellee's Br. at 30, 43; Tr. Ct. Op. at 12-13. That reliance is misplaced. **Griffin** was a medical malpractice case in which a woman complained of shoulder pain after receiving abdominal

---

[4] The jury came to its own conclusion about manner of death in Defendant's first trial; without Dr. Bollinger stating that the manner of death was homicide, the jury convicted Defendant of first-degree murder.
[5] 950 A.2d 996, 998 (Pa. Super. 2008).

surgery at a hospital. *Griffin*, 905 A.2d at 998. The shoulder injury required additional surgeries and affected her arm mobility. The woman alleged that the hospital caused the shoulder injury sometime during the abdominal operation. The woman sued the hospital and the jury returned a verdict for the woman and awarded her damages. *Id.*

On appeal, the hospital argued that the plaintiff's expert testified that there was a 51 percent probability that the hospital was responsible and a 49 percent chance that the injury was caused by a seizure, which fails the requisite degree of certainty. *Id.* at 999. We observed that expert testimony was required to determine the cause of the injury because it was a situation "where the circumstances surrounding the malpractice claim [were] beyond the knowledge of the average lay person." *Id.* at 1000. We had to determine if, in the context of a medical malpractice case, an expert needs to state the cause of injury to a "reasonable degree of medical certainty," even though the burden of proof on civil plaintiffs is generally by a preponderance of the evidence, or 51 percent. We reiterated, "if there is any other cause to which with equal fairness the injury may be attributed (and a jury will not be permitted to guess which condition caused the injury), an inference of negligence will not be permitted to be drawn against defendant." *Id.* at 1004. We held that a 49 percent chance that the injury was caused by a seizure is a near equal probability, and thus an inference of negligence should not have been drawn against the hospital. *Id.* at 1005.

*Griffin* is not applicable here. This is not a medical malpractice case, let alone a civil case. The issue in the instant case deals with manner of death, which can be natural, accidental, suicidal, or homicidal. *Griffin* deals with an injury, which could never be classified as "suicidal" or "homicidal" since there was no death involved. Most importantly, the expert in *Griffin* testified to the cause of injury, not manner of injury. Our discussion surrounded only the requisite standard for *cause* of injury in medical malpractice cases because an expert needs to testify to the requisite degree of medical certainty when proving *causation*. **See also Stimmler v. Chestnut Hill Hosp.**, 981 A.2d 145, 155 (Pa. 2009) ("An expert witness proffered by a plaintiff in a medical malpractice action is required to testify 'to a reasonable degree of medical certainty that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.'") (quoting **Welsh v. Bulger**, 698 A.2d 581, 585 (Pa. 1997)). Notably, *manner* of injury, let alone *manner of death*, was absent from our discussion in *Griffin*.

We find **Commonwealth v. Jacobs**[6] to be particularly relevant. In that case, the defendant's girlfriend and infant daughter were found dead in the bathtub at the apartment where defendant and the victims had resided. *Jacobs*, 639 A.2d at 788. The infant had drowned, and the mother had over

_____

[6] 639 A.2d 786 (Pa. 1994).

- 22 -

200 stab wounds. *Id*. The prosecution's expert witness, a forensic pathologist, testified to the cause of death of the victims; the infant died by drowning and the mother died by stab wounds. *Id.* at 789. When the prosecution asked the expert for his opinion on manner of death, the defense objected on the basis that it is the jury's job to determine manner of death, not the expert's. *Id*. The jury was sent out of the courtroom and the expert informed the judge that he intended to state that the deaths were "homicides," i.e., that in the medical sense, the deaths were not self-inflicted. The court allowed the testimony as to both cause and manner of death, and defendant was found guilty of two counts of first-degree murder. On direct appeal to the Pennsylvania Supreme Court, it was held that because the expert specified he was giving a medical opinion, not a legal conclusion, as to homicide, and because no party argued the position that the manner of death of the infant and mother was accidental, that the expert's opinion that the baby's death was homicide was not prejudicial to defendant. *Id.* at 790.

In another instructive Pennsylvania Supreme Court case, an expert, a forensic pathologist, testified as to both cause of death and manner of death of a two-year-old boy who died in a bathtub while in the defendant's care. *Commonwealth v. Woodard*, 129 A.3d 480, 488 (Pa. 2015). In that case, none of the issues raised on appeal concerned the expert's testimony as to manner of death, and the Court does not address it. However, in discussing the expert testimony at trial, the Court explains this:

At trial, the Commonwealth presented the testimony of forensic pathologist, Dr. Samuel Land, who had performed Jaques's autopsy the day after the murder. Utilizing the autopsy photos, Dr. Land summarized the multitude of injuries that he documented over the child's entire body. He noted at least ten to twenty bruises, a significant number of which had been inflicted within hours before Jaques's death . . . .

Dr. Land found that the most significant injury to Jaques's torso was the laceration to the victim's liver, extending almost completely through the liver, which occurred several hours before Jaques's death. He acknowledged that it would take a significant amount of force to lacerate the child's liver, such as would occur in a severe motor vehicle accident. . . .

Dr. Land considered, but ruled out death by drowning, explaining that drowning is diagnosed by excluding every other possibility and the presence of lethal head trauma and lethal trauma to the torso established that drowning was not a possibility. . . . *Dr. Land concluded that Jaques was beaten to death, i.e., that the cause of the victim's death was multiple blunt force trauma, and that the manner of death was homicide.*

Appellant did not testify on his own behalf. He presented the testimony of pathologist, Dr. Richard Bindie. Contrary to Dr. Land's medical opinion, Dr. Bindie opined that Jaques's brain hemorrhaging was not fatal and that the head injuries could have resulted from the child hitting his head during a fall several days before his death. He testified that Jaques's severely lacerated liver was caused by aggressive and prolonged CPR and other life-saving measures. Dr. Bindie concluded that the victim died as a result of drowning, and not homicide.

*Commonwealth v. Woodard*, 129 A.3d 480, 488-89 (Pa. 2015) (emphasis added) (internal citation to the record omitted; lengthy medical descriptions omitted for brevity, indicated by ellipses).

Relevantly, the Court noted nothing improper about the fact that the expert, after viewing the autopsy photos and explaining the victim's injuries and their probable causes, testified as to both cause of death and manner of death in his medical opinion. Moreover, *Woodward* suggests even fewer

obstacles for an expert to testify as to manner of death than in **Jacobs, supra**. In **Jacobs**, the Court reasoned, in part, that the expert's opinion as to homicide was not prejudicial to the defendant because the defendant was not asserting a contrary position: the prosecution's expert testified that manner of death was homicide, but the defendant was not arguing that the baby drowned itself or the mother stabbed herself over 200 times in an accidental manner. In **Woodward**, however, the defendant *did* take the contrary position to the prosecution's witness: the prosecution's expert testified that cause of death for the two-year old was blunt force trauma and the manner of death was homicide, while the defense posited that the cause of death was drowning, and the manner of death was accidental. Thus, whether or not a prosecution expert may testify that the manner of death is homicide does not depend on if the defendant's position is contrary, i.e., that the manner of death was accidental.

Finally, in **Commonwealth v. Yale**,[7] we dealt with a similar set of circumstances. In **Yale**, the defendant's wife was found dead at the bottom of the staircase in their home after suffering massive injuries. **Yale**, 150 A.3d at 981. Initially, the medical examiner ruled the wife had died from blunt force trauma, but made no determination regarding the manner of death, and the husband was not charged. **Id**. About a decade later, the police reopened the

---

[7] 150 A.3d 979 (Pa. Super. 2016).

investigation, and a new medical examiner reviewed the evidence and concluded that the trauma was less consistent with a fall down the steps than with being stomped to death. *Id*. All parties agreed that the cause of death was blunt force trauma; it was the manner of death, accidental or homicide, that was at issue. The prosecution's expert testified in its case in chief that the wife was stomped to death. The defendant had two expert witnesses testify that the wife's death was an accident. One defense expert thought the accident was caused by the wife falling down the stairs, the other thought the accident was likely caused by her stumbling at the foot of the staircase and falling into a pile of firewood. On rebuttal, the prosecution presented a second expert witness who stated that the cause of death was strangulation and trauma, and the manner of death was homicide. *Id*.

On appeal, the defendant argued that the trial court should not have permitted the prosecution's expert who testified during rebuttal to provide evidence that should have been offered during the prosecution's case in chief. We disagreed:

> The Commonwealth did produce testimony regarding the cause and manner of death of Mrs. Yale in its case in chief. [Prosecution expert 1] provided lengthy testimony regarding her expert medical opinion that Mrs. Yale had been murdered and that the genesis of her injuries was not an accidental fall down the steps, but was from being stomped to death.
> In his defense, Yale provided two experts who contradicted [Prosecution expert 1]'s conclusions regarding the manner of death and genesis of the blunt force trauma. The doctors provided detailed testimony regarding how they believed Mrs. Yale had suffered her fatal injuries. Although [defense experts 1 and 2] held differing opinions on where Mrs. Yale had fallen, they both agreed

- 26 -

that the catastrophic injuries she suffered were the result of an accident and not inflicted by another human. In rebuttal, [prosecution expert 2] provided his medical opinion on why [defense experts 1 and 2] were incorrect, which opinion necessarily included addressing the very issues of manner of death and genesis of the blunt force trauma. [Prosecution expert 2] primarily opined why the injuries were unlikely to have been caused by the accidental means described by the defense experts and, secondarily, the most likely method by which the injuries occurred. This testimony allowed the jury to fully consider and compare the opinions of the defense experts and the bases of those opinions. Accordingly, there was nothing improper about the subject of [prosecution expert 2]'s testimony, nor the scope of that testimony. In light of this, we find the trial court did not abuse its discretion in allowing [prosecution expert 2] to testify as to the cause and manner of death.

*Yale*, 150 A.3d at 982-83.

Relevantly, we noted nothing improper about the fact that the experts, after viewing the medical evidence and explaining the victim's injuries and their probable causes, testified as to both cause of death and manner of death in their medical opinions, regardless of what point in the trial the testimony occurred.

We now reiterate the standard we have gleaned from the relevant authorities: Manner of death refers to the circumstances under which the death occurs—whether it was natural, accidental, suicidal, or homicidal. In many circumstances, the jury comes to its own conclusion on manner of death based on the evidence, but a witness may testify to it. If a witness does testify as to manner of death, the statements need only be "probable" because they are medical opinions, not legal conclusions or facts. It is of no consequence if

the opposing party's position on manner of death is contrary. ***See***

***Reibenstein, supra; Smith, supra; Woodward, supra.***

We now must analyze Dr. Caruso's testimony in light of the above

standard and in tandem with the Pennsylvania Rules of Evidence regarding

expert testimony.

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized
>> knowledge is beyond that possessed by the average
>> layperson;
>> (b) the expert's scientific, technical, or other specialized
>> knowledge will help the trier of fact to understand the
>> evidence or to determine a fact in issue; and
>> (c) the expert's methodology is generally accepted in the
>> relevant field.

Pa.R.E. 702. The comment to this rule states that when a qualified expert

testifies, the weight of his testimony is for the trier of fact to determine.

Pa.R.E. 702 cmt. This is germane to the standard for testimony on manner of

death developed above because expert testimony is opinion, and the jury need

not take the expert's opinion on manner of death as fact.

Further, an expert must base the substance of his opinion on a

reasonable degree of certainty instead of mere speculation, but need not use

the magic legal words that his opinion is to a "reasonable degree of medical

certainty," as long as his opinion is sturdy. ***Commonwealth v. Gonzalez***,

109 A.3d 711, 727 (Pa. Super. 2015).

> Expert testimony is incompetent if it lacks an adequate basis in
> fact. While an expert's opinion need not be based on absolute

certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

***Commonwealth v. Ward***, 188 A.3d 1301, 1311 (Pa. Super. 2018).

Defendant argues that Dr. Caruso's reports and testimony were uncertain and equivocal. Appellee's Br. at 28. Defendant points out that the testimony from Dr. Caruso said that medical examiners, including himself, must rely on the evidence of law enforcement and circumstances surrounding the death to opine on manner of death, which is speculation. ***Id.*** at 34, 41. Defendant also argues that Dr. Caruso's testimony is inconsistent and cites a portion of the transcript where the trial court examines Dr. Caruso on the stand. The testimony points out that Dr. Caruso said it was "not likely" that the Defendant's version of events caused the victim's injuries, that Defendant's version of the fall was "unlikely," and that while he doesn't know what exactly caused the injuries because he wasn't there, the head trauma "could have been" inflicted upon the victim. ***Id.*** at 37-38 (citing RR 1859-1861). Defendant argues that these statements taken together are "diametrically opposed" to one another. ***Id.*** at 39. Finally, Defendant cites testimony where Dr. Caruso was asked if his opinion on manner of death was to a reasonable degree of medical certainty and he states, "It is not held to a reasonable degree of scientific certainty. It is more likely than not. Given the information I have on this case, I think the manner of death was homicide."

Appellee's Br. at 35 (citing RR 1867). The opinion does not meet the **Griffin** standard, **Id.** at 43, and highlights the expert's lack of substantive facts. **Id.** at 35.

Here, the court abused its discretion in precluding Dr. Caruso's testimony of manner of death for falling below the standard of certainty. Dr. Caruso is board-certified in anatomic pathology, clinical pathology, and forensic pathology, and has extensive experience and training in the field of aquatic deaths. N.T., 1/10/23, at 18-19. He reviewed the report of the neuropathologist who conducted tests on the victim's body, viewed autopsy photos and reports, considered the toxicology reports, and compared Defendant's testimony to Corporal Thierwechter's experiments. **Id.** at 22-24. After ruling that the cause of death was drowning, he testified to the manner of death based on his investigation of the circumstances surrounding the death in addition to the autopsy. **Id.** at 58.

He stated that the blunt force injuries to the victim's lower back were consistent with the victim being manually drowned by another. **Id.** at 64. The totality of the blunt force trauma suffered by the victim was consistent with forcibly being submerged under water. **Id.** at 61. He stated that the lack of oxygen to the brain during drowning will trigger the fight or flight mechanism, causing the drowning person to struggle. **Id.** at 65. The blunt force trauma observed on the victim's left leg, foot, and arms were consistent with someone struggling while drowning. **Id.** Dr. Caruso considered Defendant's version of

events compared to the reenactments and the inconsistencies led him to believe the victim's death was not accidental. *Id.* at 66. In particular, he compared the injuries the victim suffered with Defendant's lack of injuries. He noted that if Defendant had been positioned on the back of the ATV as he described, it would have been Defendant who was more severely injured. *Id.* at 72-73. Thus, his opinion was that the manner of death is homicide.

His testimony has an adequate basis in fact because he testified to the many factors he considered in excluding accident as the manner of death: Defendant's lack of injuries, the victim's toxicology report showing a lack of food or alcohol in her stomach, investigative evidence such as the missing cell phone, and the injuries to the victim's lower back, knees, and tops of her feet. To hold that Dr. Caruso's opinion was based on "mere speculation" would be in error. In light of Defendant's position that the death was accidental, Dr. Caruso's opinion on manner of death adds value because the jury will be more informed in comparing the contrary positions. *Yale*, 150 A.3d at 983 ("This testimony allowed the jury to fully consider and compare the opinions of the defense experts and the bases of those opinions."). For the expert to give a detailed description of the injuries but offer no opinion as to if their cause was more likely accidental, suicidal, or homicidal in *that* expert's opinion could be more confusing to the jury than allowing the witness to state the opinion and its basis and be cross-examined regarding his level of certainty, and letting the jury weigh the testimony.

We hold that Dr. Caruso is a qualified expert witness whose testimony is competent and has an adequate basis in fact. The court erred in holding that his testimony was uncertain because of his use of language including "unlikely," "possibility," "I don't think," "probably," and "consistent with" at various times throughout his testimony. Tr. Ct. Op. at 13. Dr. Caruso specified to the trial judge that medical examiners and coroners use the standard of "more likely than not" to describe manner of death:

> THE COURT: Doctor, something caught my ear. You said that manner of death is not to a reasonable degree of medical or scientific certainty, it's just more likely than not. Is that –
> THE WITNESS: That's the standard, Your Honor, yes. It's more likely than not. That's what the coroners use as a standard as well.

N.T., 1/10/23, at 173. Thus, his reasoning for not using the magic legal words of "to a reasonable degree of medical certainty" does not make his testimony speculative or incompetent. **See Gonzalez, supra; see also Commonwealth v. Yocolano**, 169 A.3d 47, 61 (Pa. Super. 2017) ("while an expert need not use 'magic words,' the foundation of her opinion must still be sturdy." (citing **Commonwealth v. Spotz**, 756 A.2d 1139, 11[6]0 (Pa. 2000)). Nonetheless, as stated above, manner of death determinations are required to be "probable" and not "definitive," unlike *cause* of death determinations, so Dr. Caruso's language is analogous to the standard as developed herein.

This result is compatible with the holding in **Commonwealth v. Spotz**, 756 A.2d 1139 (Pa. 2000). In that case, the expert who testified for the

Commonwealth as to both cause and manner of death was a pathologist for a coroner, but was not a coroner himself. Although he had the authority and experience sufficient to make cause of death determinations, he testified that the coroner is the one whose "province" it is to make manner of death determinations. *Id*. at 1160. On appeal, the defendant argued that the Commonwealth's expert: (1) was unqualified; and (2) did not state his opinion in terms of a reasonable degree of medical certainty. First, our Supreme Court held that although it may have been another's "province" to determine manner of death, it does not mean that the expert who testified was unqualified to make that decision. *Id*. In his professional capacity, he performed autopsies and made recommendations on the manner of death just as a coroner does, so the Court held he was qualified. *Id*. Second, the Court stated that experts are not required to use "magic words" and that appellate courts must look to the substance of the expert's testimony to ensure the opinions were not based on mere speculation but instead had a reasonable degree of medical certainty, just as we have done herein. *Id.* at 1160-61.

Here, Dr. Caruso is a pathologist who, like the pathologist in *Spotz*, in addition to explaining his medical background and training, explained the medical basis for his opinions. As quoted above, he stated that he was making his determination with the same level of certainty that coroners use, irrespective of what he labeled that standard, making him qualified pursuant to *Spotz, supra*. Dr. Caruso may testify at trial regarding his medical opinions

as to the cause and manner of death and his reasons for those opinions; any equivocal language lends to his credibility and the jury is free to disbelieve his opinion. *See* Pa.R.E. 702 cmt. (the weight of an expert's opinion is for the fact finder to decide).

Accordingly, we reverse the trial court's order denying the Commonwealth's request to present Corporal Thierwechter's experimental evidence and Dr. Caruso's manner of death testimony at trial. We remand for proceedings consistent with this opinion.

Order reversed in part, affirmed in part.

Jurisdiction relinquished.

J. Nichols joins the opinion.

J. Lazarus files a concurring/dissenting opinion.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 05/17/2024